UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID FORTE and GREGORY MANNING,<br><br>Defendants. | Criminal Action No. 22-cr-10026-ADB |

**MEMORANDUM & ORDER**

BURROUGHS, D.J.

On February 1, 2022, a grand jury returned an indictment against David Forte and Gregory Manning ("Manning") charging them with conspiring to commit securities fraud and aiding and abetting securities fraud based on allegations of insider trading. [ECF No. 28 ("Indictment")]. Currently pending before the Court is Manning's motion to suppress statements he made to FBI agents during an April 7, 2021 interview. [ECF No. 135]. Manning argues that the agents should have, but failed, to give him his Miranda warnings and further, that the statements were involuntary. In the alternative, Manning argues that the statements are unreliable and therefore inadmissible under Rule 403 of the Federal Rules of Evidence. For the reasons set forth below, the motion to suppress, [ECF No. 135], is DENIED.

I.      BACKGROUND

     A.      **Factual Background**

The following facts are undisputed.  At approximately 7:30 am on April 7, 2021, plain-clothed FBI special agents Keith Brown and James Bedsole (the "Agents") knocked on the door to Manning's residence. [ECF No. 140-1 ("Bedsole Aff.") ¶¶ 2–3)].  After Manning's son, Sean Manning, answered the door, the Agents asked to speak with Manning and then waited outside Manning's front door until Manning came to the door dressed.  [Id. ¶ 4].  After they displayed their credentials, Manning invited the Agents into his living room.  [Id.].  Once there, the Agents interviewed the Manning for between an hour and an hour and a half.  [Id. ¶¶ 5, 15; ECF No. 135-2 ("Sean Manning Aff.") ¶ 5].  At no point did the Agents physically restrain Manning, engage in a show of force, or invade Manning's personal space.  [Bedsole Aff.].  Manning did not ask for a break, or ask the Agents to leave.  [Id.].

The parties dispute many of the remaining facts concerning the April 7, 2021 encounter between Manning and the Agents.  For purposes of this motion, however, the Court accepts the version of the facts offered Manning.  Even crediting Manning's characterization of the facts, the Court finds that the facts are insufficient to establish that the statements were involuntary or that the interview was custodial and, therefore, improper under Miranda.

According to Manning, when the Agents arrived at his home, they represented that they wanted to ask him a few questions about a routine investment he had made. [ECF No. 135-1 ("Gregory Manning Aff.") ¶ 3].  Based on that representation, Defendant agreed to speak with them.  [Id. ¶ 4].  When they went to the living room, one Agent sat directly in front of Manning and the other sat to his right "out of his field of vision," [ECF No. 135 at 3], which made him feel like he was "in the cross-hairs," [Gregory Manning Aff. ¶ 4].  While the conversation began

in a "business-like" tone and seemed to be "routine," [ECF No. 135 at 3], after several minutes the conversation shifted to the subject of the instant prosecution and the Agents' tone "became accusatory and confrontational," [id.]. During this part of the conversation, the Agents "frequently interrupted and talked over" Manning and questioned him in "rapid-fire fashion." [Gregory Manning Aff. ¶ 5]. Manning characterizes this as Agents "l[ying] about the purpose for which they wanted to speak with him." [ECF No. 135 at 14].

The shift in the subject and tenor of the conversation had a "severe and visible effect" on Manning physically and mentally, as he became "psychologically distressed and confused." [ECF No. 135 at 4]. The Agents also noted a change in Manning's appearance and demeanor, and later commented that Manning almost "fell out of his chair" and started sweating when the topic of conversation shifted to matters related to the instant prosecution. [Id.; Gregory Manning Aff. ¶ 6; ECF No. 135-3 ("Hogan Aff.") ¶ 4]. As a result of the change in his mental state, Manning had difficulty understanding and responding to the Agents' questions. [ECF No. 135 at 4; Gregory Manning Aff. ¶¶ 6–8; Sean Manning Aff. ¶¶ 6, 14]. Manning's son, who was listening from another room several feet away, [ECF No. 135 at 4; Sean Manning Aff. ¶ 5], described his father as having "stumbled," "stutter[ing] repeatedly," and speaking "as if the wind has been knocked out of him." [ECF No. 135 at 4; Sean Manning Aff. ¶ 6].

Manning suffers from Attention Deficit Hyperactivity Disorder, Inattentive Subtype ("ADHD"). [Gregory Manning Aff. ¶ 9]. Moreover, sometime between the events of April 7, 2021 and April 18, 2021, Manning "suffered psychosis" or a "break from reality" involving hallucinations and delusions that resulted in an involuntary hospitalization. [ECF No. 135 at 5]. According to the Manning's psychiatrist, Dr. Posternak, this psychosis resulted from Manning's

prescribed use of Adderall and it "would not be surprising if the psychosis was triggered during the stress of the FBI interview." [ECF No. 135 at 5].

Despite signs of mental distress, the Agents "continued and intensified their interrogation," including multiple instances of threats of incarceration. [ECF No. 135 at 5; Gregory Manning Aff. ¶¶ 6–7; Sean Manning Aff. ¶ 10]. Manning felt "compelled to answer the agents' questions" and "believed that he would go to jail if he did not answer the agents' questions." [ECF No. 135 at 5; Gregory Manning Aff. ¶¶ 7–8]. Manning describes trouble answering questions not only because of his "psychotic break," but also because the Agents "frequently made statements and accusations to which [he] could not, or did not reply" and "asked . . . compound questions," to which Manning only partially responded. [ECF No. 135 at 5; Sean Manning Aff. ¶9]. Manning ultimately describes the interrogation as "relentless and exhausting." [ECF No. 135 at 5].

### B. Procedural History

On March 15, 2023, Defendant filed a motion to suppress the statements he made to the Agents on April 7, 2021. [ECF No. 135]. The government opposed the motion on April 13, 2023. [ECF No. 140]. On April 18, 2023, Manning sought permission to file a reply, [ECF No. 145], which was granted on April 26, 2023, [ECF No. 148]. On April 27, 2023, another session of this Court held an evidentiary hearing on the motion to suppress. See [ECF Nos. 149, 150].[1] On May 8, 2023, the case was reassigned to this session of the Court. [ECF No. 153]. The

---

[1] The Court has reviewed the transcript of the April 27, 2023 hearing.

4

government then, with leave of the court, filed a sur-reply on May 10, 2023. [ECF Nos. 147, 148, 155].[2]

## II. DISCUSSION

Manning makes two constitutional arguments in support of his contention that his statements should be suppressed: (1) that his statements were compelled and involuntary under the Fifth Amendment and (2) that he was in custody and Agents improperly failed to give him the warnings required by the Supreme Court's ruling in Miranda v. Arizona, 384 U.S. 436 (1966). In the alternative, Manning argues, that the statements are inadmissible under Rule 403 of the Federal Rules of Evidence.

### A. Constitutional Basis for Suppression

#### 1. The statements were voluntary

Admission of an involuntary statement is a violation of the Due Process clause. Dickerson v. United States, 530 U.S. 428, 433 (2000). The touchstone of involuntariness is "whether the will of the defendant [was] overborne," Bryant v. Vose, 785 F.2d 364, 367–68 (1st Cir. 1986) (quoting Procunier v. Atchley, 400 U.S. 446, 453, (1971)) (further citations omitted),

---

[2] The Court notes that Manning never actually filed his reply, but since the government has responded, the court will rely on the copy of Manning's reply that was attached to his motion to file. See [ECF No. 145-1].

Additionally, Manning's reply states that he is entitled to an evidentiary hearing, [ECF No. 145-1 at 5], but his motion to file was docketed before the April 27, 2023 evidentiary hearing. The government's May 1, 2023 sur-reply refutes Manning's entitlement to an evidentiary hearing, but refers to Manning's April 18, 2023 reply as being "filed yesterday[,]" [ECF No. 155 at 1], suggesting that that portion of the sur-reply was written prior to the April 27, 2023 hearing. The Court does not read either filing as requesting a second evidentiary hearing. If any party believes another evidentiary hearing is warranted, they may request one.

Finally, Manning's reply includes allegations of discovery violations. See [ECF No. 145-1]. The Court declines to resolve this discovery dispute within the context of a motion to suppress.

which requires a court to consider the totality of the circumstances, United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011). "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect." Hughes, 640 F.3d at 438 (citations omitted). When questioning takes place in a "more familiar or neutral" setting, such as in a suspect's own home, the interview is less likely to be deemed coercive. United States v. Rondeau, No. 20-cr-40049, 2022 WL 4084311, at *7 (D. Mass. Sept. 6, 2022) (citing Beckwith v. United States, 425 U.S. 341, 347 (1976)). A "defendant's mental state or condition . . . is never dispositive of the inquiry into constitutional voluntariness." United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) (citing Colorado v. Connelly, 479 U.S. 157, 170 (1986) and United States v. Palmer, 203 F.3d 55, 61–62 (1st Cir. 2000)). An assessment of voluntariness has "always depended on" the actions of the officers or agents. Id.; see also Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); United States v. Boskic, 545 F.3d 69, 78 (1st Cir. 2008) ("[o]nly confessions procured by coercive official tactics should be excluded as involuntary") (quoting United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998)).

Even accepting Manning's characterization of the facts, described above, they fall short of the standard required for suppression under the Fifth Amendment. Manning has not asserted that the Agents coerced his statement by making promises or depriving him of essentials. While the Agents may have come early in the morning, they were in Manning's house by his invitation and did not physically restrain him or draw their weapons. Manning claims that the Agents mislead him as to the purpose of the interview, but courts have rarely held that deception or

ploys designed to lure a suspect into answering questions are sufficient to render a statement involuntary. See, e.g., Illinois v. Perkins, 496 U.S. 292, 298 (1990); United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998); United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000) (quoting Byram, 145 F.3d at 408); United States v. White, 847 F. Supp. 219, 225 (D. Mass. 1994) (citing Colorado v. Spring, 479 U.S. 564, 575–76 (1987)).

Additionally, while Manning asserts that he was suffering "severe mental distress" during the encounter, [ECF No. 135 at 14], the record does not support of a finding that law enforcement knew or should have known about his mental condition, that law enforcement's tactics were designed to exploit his mental distress, and that those tactics elicited Defendant's statements. See Hughes, 640 F.3d at 438–40. As noted above, "[a] defendant's mental state or condition" must be considered in the context of "its relationship to official coercion," and mental distress alone does not warrant suppression. Rojas-Tapia, 446 F.3d at 7. Considering the totality of the circumstances as characterized by Manning, the Court finds Manning's statements were not involuntary.

2. Manning was not in custody

Under Miranda v. Arizona, 384 U.S. 436 (1966), statements obtained in a custodial interrogation are generally inadmissible unless law enforcement has observed the applicable procedural safeguards including warning the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. at 444. It is axiomatic that the procedural safeguards outlined by Miranda are only required during a "custodial interrogation," Rhode Island v. Innis, 446 U.S. 291, 297 (1980), which the Supreme Court has defined as

7

"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," Miranda, 384 U.S. at 444.

To determine whether an individual is in custody for the purposes of Miranda in situations in which there has not been an arrest, "district court[s] look[ ] to the totality of the circumstances surrounding the questioning and determine[ ] whether a 'reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" United States v. Arroyo, 972 F. Supp. 2d 112, 121 (D. Mass. 2013) (quoting United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007)).  The First Circuit has identified four factors to be considered in this analysis: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).  The degree of physical restraint involved is given the most weight.  United States v. Davis, 773 F.3d 334, 340 (1st Cir. 2014) (citing Mittel-Carey, 493 F.3d at 40).

Here, the location of the interview, the fact that only two officers were present, and the fact that there was no physical restraint or circumstances sufficiently supporting a finding that the agents exercised extensive control over Manning's freedom of movement, all weigh against finding Manning was in custody.  See Hughes, 640 F.3d at 436–37 (describing defendant's home as prototypical "familiar" location); id. at 436 (finding an interview noncustodial where two officers conducted the interview); United States v. Infante, 701 F.3d 386, 397 (1st Cir. 2012) (finding an interview noncustodial in part because "the number of officers was not overwhelming" where two officers conducted most of the interview); compare Mittel-Carey, 493 F.3d at 40 (finding that the "level of physical control the agents exercised over [the

8

defendant]," weighed heavily in favor of finding the interrogation custodial where defendant was "ordered to dress, go downstairs, and [] told where to sit; . . . physically separated from his girlfriend and not allowed to speak to her alone; and [] escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom[,]" ).[3]

Additionally, because the Miranda inquiry is objective in nature, see United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012) (quoting Maryland v. Shatzer, 559 U.S. 98, 130 (2010)), Manning's subjective belief that he was not free to leave is insufficient to give rise to suppression. Even accepting the Manning's characterization, the Court is unable to find that a reasonable person would not have felt "at liberty to terminate the interrogation and leave." Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). Thus, after weighing the four factors and considering the totality of the circumstances, the Court finds that the interview was not custodial and, therefore, Miranda warnings were not required.

**B.     Admissibility**

Alternatively, Manning argues that these statements are unreliable and therefore inadmissible under Federal Rule of Evidence 403. The Court will exercise its discretion and deny the motion with leave to renew pending further pretrial proceedings. See Navarro de Cosme v. Hosp. Pavia, 922 F.2d 926, 930 (1st Cir. 1991) ("[T]rial court[s] enjoy[] considerable latitude in managing pretrial matters.").

---

[3] While Manning seems to imply that the Court should consider his mental distress at the time of the encounter in this analysis, [ECF No. 135 at 12], he does not point to any caselaw showing how or why his subjective mental condition is relevant.

### III. CONCLUSION

For the foregoing reasons, Manning's motion to suppress, [ECF No. 135], is <u>DENIED</u>.

**SO ORDERED.**

May 15, 2023

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE
