UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * * * * * | |
| v. | * * * | Criminal Action No. 22-cr-10026-ADB |
| DAVID FORTE, | * * * | |
| Defendant. | * * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On July 20, 2023, a jury found David Forte ("Mr. Forte") guilty of conspiring to commit securities fraud and aiding and abetting securities fraud based on allegations of insider trading. [ECF No. 213]. Currently before the Court is Mr. Forte's motion for acquittal or, alternatively, for a new trial. [ECF No. 222]. For the reasons set forth below, the motion is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Indictment and Procedural History

On February 1, 2022, a grand jury returned a two-count indictment against David Forte ("Mr. Forte"), John Younis ("Mr. Younis"), and Gregory Manning ("Mr. Manning"). [ECF No. 28 ("Indictment")]. The Indictment alleges that Mr. Forte obtained material non-public information ("MNPI") about the acquisition of Linear Technology ("Linear") by Analog Devices, Inc. ("Analog") ("Analog-Linear Deal"), [id. ¶¶ 9–11], from his brother, Peter Forte,

who was a senior executive at Analog, see [id. ¶ 5; ECF No. 133 at 3–4].[1]  The Indictment

further alleges that Mr. Forte provided this MNPI to Mr. Younis and Mr. Manning, who traded

based on this information in July 2016, shortly before and after the announcement of the Analog-

Linear Deal.  [Id. ¶¶ 14–31].  Mr. Forte, Mr. Younis, and Mr. Manning were all charged with:

- One count of Conspiracy to Commit Securities Fraud in violation of 18 U.S.C. § 1349 (Count One); and
- One count of Securities Fraud; Aiding and Abetting in violation of 15 U.S.C. §§ 78(b) and 78ff(a); 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2.

[Indictment at 8–9].

In March 2022, Mr. Younis pleaded guilty to both counts.  [ECF Nos. 45, 49].  On

January 18, 2023, Mr. Forte moved to sever his trial from Mr. Manning's trial.  [ECF No. 123].

The case was reassigned to this Court on May 8, 2023, [ECF No. 153], and the Court granted

Mr. Forte's motion to sever, which was unopposed, on May 16, 2023, [ECF No. 162].

Mr. Forte's case was tried to a jury over four days, beginning on July 17, 2023.  [ECF

Nos. 202, 206, 210, 212].  At the close of the government's case, Mr. Forte moved for a

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  [ECF No. 216 at

110:17–18; 111:6–12].  The Court denied the motion.  [ECF No. 230 at 71:16–18].  Mr. Forte

renewed his motion for acquittal at the close of his case, which the Court again denied.  [ECF

No. 217 at 8:10–13].  The jury returned its verdict on July 20, 2023, finding Mr. Forte guilty on

both counts.  [ECF No. 213].  On August 24, 2023, Mr. Forte filed a renewed motion for

---

[1] The Indictment alleges that Mr. Forte obtained the MNPI from "Individual 1," who is a "close relative" of Mr. Forte.  See [Indictment ¶ 5].  In subsequent filings, "Individual 1" was identified as Peter Forte, Mr. Forte's brother.  See, e.g., [ECF No. 133 at 3–4].

acquittal, or alternatively, a new trial.  [ECF No. 222].  The government opposed the motion on

September 7, 2023.  [ECF No. 224].[2]

**B.     Evidence at Trial**

In reaching its verdict, the jury could have found the following facts, based on the

evidence presented at trial.[3]  This summary is intended to provide an overview and is

supplemented as needed throughout the memorandum and order.[4]

### 1.     Peter Forte's Role at Analog and His Relationship with Mr. Forte

Mr. Forte's older brother, Peter Forte, worked at Analog, a semiconductor company,

from 1988 through his retirement in 2021.  [ECF No. 230 at 39:21–25, 40:12–17].  As of 2016,

Peter Forte was Analog's Chief Information Officer, [id. at 44:19–20], and his responsibilities

included working on the company's mergers and acquisitions, [id. at 44:19–20, 45:17–19].  He

was required to sign confidentiality agreements for all mergers that had not yet been made public

and about which he was made aware.  [Id. at 49:14–20].

Peter Forte testified that his and Mr. Forte's relationship was not particularly "deep" and

they did not share "personal confidences," but also that their relationship was good and that he

trusted him.  [ECF No. 230 at 42:22–43:7, 61:5–6, 61:20–21].  He additionally testified as to

---

[2] Since Mr. Forte filed this Motion, on October 11, 2023, Mr. Manning pleaded guilty to both charges.  [ECF Nos. 225, 232].  He was sentenced on January 23, 2024.  [ECF No. 256].

[3] The Court presents the evidence in the light most favorable to the verdict.  See United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018).

[4] The testifying witnesses at trial included Peter Forte, William ("Bill") Martin, Analog's former Vice President of Mergers and Acquisitions; James Bedsole, FBI Special Agent; Mr. Younis, former co-defendant; Peter Melley, Director of the Financial Industry Regulatory Authority's ("FINRA") Criminal Prosecution Assistance Group; Jimmy Pappas, Partner at Marcum LLP, a public accounting firm; and Leora Rooney, a summer intern for defense counsel, who served as a summary witness regarding phone records.

other details of their relationship, including that he does Mr. Forte's taxes.  [Id. at 42:6–43:7, 63:5–64:2].  In 2016, due to their father's and aunts' deaths and other events in their family, they spent more time together and spoke more often than usual.  [Id. at 43:8:–44:18].  Their conversations over this time included causal discussions about work; how busy Peter Forte was; how things were going; etc.  [Id. at 62:4–8].

    2.    <u>Mr. Forte's Relationship with Mr. Younis and Mr. Manning</u>

Mr. Forte, Mr. Younis, and Mr. Manning went to high school together.  [ECF No. 215 at 124:24–25].  In 2016, they continued to have a large, close group of friends from high school, [id. at 125:9–21; 145:20–146:7], and Mr. Forte and Mr. Younis spoke frequently, [id. at 146:8–13.  They had nicknames for each other (Mr. Forte was referred to as "Ike," Mr. Manning as "Mo," and Mr. Younis as "Youny").  [ECF No. 215 at 128:22–129:4; ECF No. 230 at 55:18–56:6].  The group often took multiple trips a year together, including a ski trip and a trip to Martha's Vineyard in the summer.  [ECF No. 215 at 127:9–12].

    3.    <u>Mr. Younis and Mr. Manning's Prior Trading Histories</u>

Peter Melley ("Mr. Melley"), Director of FINRA's Criminal Prosecution Assistance Group, testified that based on his review of trading data, Mr. Younis was not a particularly active trader prior to his trading in Linear stocks in July 2016.  [ECF No. 216 at 29:16–18, 57:12–24].

> In the couple of years leading up to July of 2016, [Mr.] Younis basically had one stock that he had held for a particular period of time for at least over a year, and really the rest of his investments were in muni[cipal] funds, money market funds. There was not a lot of activity.  And then really from the end of 2015 all the way until he makes that deposit of $60,000 in the account, there is under $500 traded on – just held in the account.  So it was pretty dormant until July of 2016.

[Id. at 57:16–24].  After Mr. Younis' Linear trading, he

> turned around and invested in a number of different options for different stocks, different companies like Facebook, Apple, Tesla, a lot of big time name brands and engaged in options trading over the next couple of months through the fall of 2016.
>
> . . .

> There were no real companies that he was as profitable as he was with Linear.  He would make some on a Facebook option but then turn around and lose some on another Facebook option.  And same for some of these other stocks, like Apple and so forth.  So some of his gains were small, some of his losses were small, some of his losses were larger.

[Id. at 59:13–25].

Additionally,  Mr. Melley testified, also based on his review of trading data, that Mr. Manning was a more active trader than Mr. Younis:

> Both in his own account and in the trading in his wife's account, . . . there was a much higher account value[:] . . . hundreds of thousands of dollars on a monthly basis, many more holdings.  A number of the holdings were . . . long-term holdings where they had stock for a few years before selling them. . . .  [T]hose accounts were much more actively traded . . . .

[ECF No. 216 at 62:25–63:7].  In 2009 and again in 2013, Mr. Manning traded in Linear stock, though both trades resulted in relatively small profits, and were much smaller investments than those at issue at trial, which Mr. Manning made in July 2016.  [Id. at 62:13–22].

### 4.      Analog's Acquisition of Linear and Mr. Manning and Mr. Younis' July 2016 Linear Trading

Analog became interested in acquiring Linear, another semiconductor company, in 2014 or 2015.  [ECF No. 215 at 39:19–41:10].  Analog was an "active" participant in the M&A market, [id. at 61:21–62:1], but this potential acquisition was the "largest transaction [Analog] had ever contemplated," [id. at 47:23–24].  At this stage, this information would not have been public, and, even at Analog, only five to ten people would have been aware of it.  [Id. at 40:24–41:1].

In the spring of 2016, Analog began more serious acquisition discussions with Linear.  [ECF No. 215 at 41:11–21].  Again, very few people at Analog—five to ten—would have known about this.  [Id.].

In June 2016, Analog began to conduct due diligence on Linear in earnest.  [ECF No. 215

at 42:20–24].  Peter Forte was made aware of the Linear deal and became involved in the due

diligence process in the latter half of June 2016.  [Id. at 52:9–19, 75:14–19; ECF No. 230 at

62:16–63:4].  This was one of several potential acquisitions Peter Forte was working on at the

time.  [ECF No. 230 at 48:4–8].

In 2015 and 2016, there was a trend of consolidation in the semiconductor industry, [ECF

No. 216 at 115:13–17], and news articles suggested that companies, including Linear and

Analog, could be involved in mergers and acquisitions, [id. at 121:11–122:24].  Additionally, a

June 2016 8-K filed by Linear referenced a potential "change of control of the Company."[5]  [Ex.

541].  That said, there is no evidence that Mr. Forte, Mr. Younis, or Mr. Manning were aware of

any of this information.  Mr. Younis also testified that he was not aware of any publicly available

information about the Analog-Linear Deal when he invested in Linear.  [ECF No. 215 at 136:9–

23].

On Thursday, July 14, 2016, Peter Forte received an email stating that "significant

progress ha[d] been made" on the Linear deal.  [ECF No. 215 at 49:20–51:22; Ex. 3].  He

received another email on Friday, July 15, indicating that the "extremely tight schedule call[ed]

for diligence report-outs" on the following Tuesday, prior to the submission of a "comprehensive

diligence report," which would "likely require work over the weekend."  [ECF No. 215 at 52:7–

53:6; Ex. 4].  Shortly thereafter, Peter Forte received another email stating that the "synergy

summaries," one of which Peter was responsible for, "[were] also due by end of day Monday."

---

[5] Specifically, the 8-K indicated that the Board intended to "[e]nter[] into executive contracts
with those of the Company's executive officers, and certain other key employees, who do not
currently have such agreements . . . to provide [those officers and employees] certain benefits
upon a qualifying termination of their employment in connection with a change of control of the
Company," believing "these benefits will help ensure the continued dedication and objectivity of
all the Company's executive officers and other key employees in the event of the possibility,
threat or actual occurrence of a change of control."  [Ex. 541 at 2–3].

[ECF No. 230 at 62:21–24; Ex. 4].

On that Sunday, July 17, Mr. Forte and Peter Forte spoke on the phone for nearly nine minutes.  [ECF No. 215 at 100:11–101:24; Ex. 122].  Roughly an hour later, Mr. Forte called Mr. Younis, and they spoke for just under three minutes.  [Ex. 122].  Mr. Younis could not recall Mr. Forte's exact words, but he testified that during this call, he learned from Mr. Forte that Analog was going to acquire Linear.  [ECF No. 215 at 130:2–12].  Further, Mr. Younis specifically testified:

- He understood from Mr. Forte that the acquisition was going to happen sooner rather than later.  [Id. at 132:23–133:4].

- He, Mr. Younis, was aware that this information was not public.  [Id. at 133:23–25].

- Mr. Forte told him to buy "call options," and to buy fewer than forty contracts.  Mr. Younis' understanding as to why Forte told him to keep his purchase under forty contracts was that it would avoid detection.  [Id. at 130:17–131:19].

- Mr. Forte stated that Mr. Younis could buy as many Linear shares as he wanted, but he should also buy "put" options, to "mak[e] it look like a straddle," that is, to make it seem like he was unaware whether prices would "go up or go down."  [Id. at 134:1–25].

- Mr. Forte told him not to buy Analog securities, because his brother worked at Analog.  [Id. at 132:2–11)].

- Mr. Forte proposed that they split the money that Mr. Younis made from these trades.  [Id. at 132:15–19].

- Mr. Forte told Mr. Younis that he was sharing this information with Mr. Manning (nicknamed "Mo") as well.  [Id. at 135:3–11)].

Mr. Younis testified that he invested in Linear based on this information and had no other information about the acquisition.  [ECF No. 215 at 135:18–21, 136:9–19].

Mr. Younis also testified that it was his understanding that Mr. Forte got the information about the Linear acquisition from Peter Forte.  [ECF No. 215 at 132:23–133:9].  Peter Forte testified that he did not give Mr. Forte the information, but also could not rule out the possibility

that he may have figured something out.  [ECF No. 230 at 50:10–19, 67:3–68:3].

At the time of the call, Mr. Younis had approximately $50 in his brokerage account. [ECF No. 215 at 135:22–25]; see also [ECF No. 216 at 48:4–6 (Melley testified that "up until this point for pretty much since mid 2015, on average there was under $500 in the account and very little activity.")].  The next day, Monday, July 18, Mr. Younis transferred $60,000 into the account.  [ECF No. 216 at 47:19–48:8; Ex. 122].  Mr. Younis and Mr. Forte spoke again on July 19 and then again on July 20.  [ECF No. 216 at 48:9–11; Ex. 122].  On Thursday, July 21, Mr. Forte spoke briefly with Peter Forte.  [Ex. 122].  Roughly an hour later, Mr. Younis received six calls, all within an hour, from a company called Period Realty Trust, where Mr. Forte worked at the time.  [Exs. 122, 140].  Within an hour of the last of these calls, Mr. Younis bought thirty-five Linear call options, for $4,800.  [ECF No. 216 at 48:18–23].  Peter and Mr. Forte spoke several more times that night.  [Ex. 122].  Mr. Forte also had a brief call (lasting ten seconds) with Mr. Manning.  [Id.].

The following day, Friday, July 22, after speaking with Mr. Forte again in the morning, Mr. Younis bought 1,100 shares of Linear stock, for $53,000.  [ECF No. 216 at 49:4–11].  On the same day, Mr. Forte tried calling Mr. Manning twice, Mr. Manning tried calling Mr. Forte back, and Mr. Forte and Mr. Manning had a brief, twenty-three second call at 9:40 AM.  [Ex. 122].  Two minutes later, at 9:42 AM, Mr. Manning bought 1,000 Linear Shares.  [Id.].  Later that day, Mr. Forte tried calling Mr. Manning again.  [Id.].

Two days later, on Sunday, July 24, Mr. Forte and Mr. Younis spoke again, for just under a minute at 5:05 PM, and again for several minutes at 5:19 PM.  [Ex. 122].  Between those calls, Mr. Forte tried calling Mr. Manning twice.  [Id.].  The following day, Monday, July 25, Mr. Forte called Mr. Manning twice, before Mr. Manning called him back and they spoke for just

under four minutes.  [Id.].  Roughly an hour and a half after that call, Mr. Manning purchased 750 Linear shares.  [Id.; ECF No. 216 at 50:3–9].

On the morning of Tuesday, July 26, Mr. Forte spoke to Mr. Manning again for seven and a half minutes, and, again, within several hours, Mr. Manning and Jennifer Manning, Mr. Manning's wife, bought additional Linear shares.  [ECF No. 216 at 50:16–51:2; Ex. 122].  Around noon, Mr. Younis also bought twelve Linear put options.  [ECF No. 216 at 51:3–4; Ex. 122].

That afternoon, at 2:23 PM, Bloomberg first reported that Analog was "in advanced talks to acquire" Linear.  [Ex. 44].  Within twenty minutes of this report, Mr. Forte tried calling both Mr. Younis and Mr. Manning three times.  [Ex. 122].  Mr. Younis called Mr. Forte back and they spoke for roughly a minute.  [Id.].  Five minutes after that, Mr. Forte called Peter Forte and they spoke for several minutes.  [Id.].  At 2:47 PM, Nasdaq halted Linear trading, [id.], and less than ten minutes later Mr. Younis tried, unsuccessfully, to sell thirty-five Linear call options.  [ECF No. 216 at 53:5–12; Ex. 122].  Six minutes after that, Mr. Younis called Mr. Forte and they spoke for five minutes.  [Ex. 122].

Roughly an hour after the Bloomberg report, at 3:35 PM, Analog and Linear issued a press release, announcing that they had reached an agreement for Analog to acquire Linear. [ECF No. 215 at 54:17–21; Ex. 48].  Bill Martin testified that the Bloomberg report was the result of a leak, and it prompted Analog and Linear to make an announcement sooner than they otherwise would have as Analog would typically have waited to make an announcement like this until after the markets closed, to avoid creating market "volatility."  [ECF No. 215 at 55:8–13].

Roughly half an hour after the press release, Mr. Forte called Mr. Manning and they spoke for nearly five minutes.  [Ex. 122].  That afternoon and evening, they spoke three more

times.  [Id.].

The next morning, July 27, between 8:40 and 9:30 AM, Mr. Forte spoke to both Mr. Younis and Mr. Manning.  [Ex. 122].  Minutes after getting off the phone with Mr. Forte, Mr. Younis sold his thirty-five Linear call options for a profit of $38,782.13.  [ECF No. 216 at 53:24–54:4; Ex. 122].  He then immediately called Mr. Forte back, and then minutes after getting off this call sold 1,100 Linear shares for a total profit $12,943.46.  [ECF No. 216 at 54:6–8; Ex. 122].  At the same time, Mr. Manning sold 2,250 Linear shares, for a total profit of $26,771.68, and Jennifer Manning sold 750 Linear shares for a total profit of $7,979.06.  [ECF No. 216 at 54:5–6; Ex. 122].  Around 10:30 AM, Mr. Forte spoke to Mr. Younis again, for roughly five minutes.  [Ex. 122].  Around midday, Mr. Forte tried calling Mr. Manning several times, before speaking with for him for approximately twenty minutes.  [Id.].

Mr. Younis testified that he gave a portion of his profits to Mr. Forte.  [ECF No. 215 at 137:17–20].  They met at a restaurant in Framingham, and Mr. Younis handed Mr. Forte a bag with his share in cash, which he calculated, after taxes, to be roughly $19,000.  [Id. at 138:2–139:6].

In January 2017, Peter Forte and others involved with the Analog-Linear Deal received an email attaching a list of names of individuals who had traded in Linear common stock and who may have known about the Analog-Linear Deal.  [ECF No. 230 at 53:25–54:3; Ex. 137].  The list was compiled by FINRA as part of a standard review.  [ECF No. 230 at 54: 7–12; Ex. 137].  Peter Forte and the other recipients of this email were asked to identify whether they knew any of these individuals.  [ECF No. 230 at 55:4–6; Ex. 138].  Mr. Younis, Mr. Manning, and Mr. Manning's wife were all on the list.  [ECF No. 230 at 55:10–17; Ex. 137].  Peter Forte responded that he did not know any of the individuals on the list.  [ECF No. 230 at 55:3–6; Ex. 138].  He

testified that he did not, at the time, recognize Mr. Younis or Mr. Manning's names as his
brother's friends, and that he had last seen them several decades before, in high school.  [ECF
No. 230 at 55:14–56:18].

## II.        ACQUITTAL UNDER RULE 29

### A.        Legal Standard

To prevail on a motion for judgment of acquittal under Rule 29, a defendant must "show
that the evidence presented at trial, even when viewed in the light most favorable to the
government, did not suffice to prove the elements of the offenses beyond a reasonable
doubt."  United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018).  At trial, the government
may make its case by "either direct or circumstantial evidence, or by any combination thereof."
United States v. Larrabee, 240 F.3d 18, 21 (1st Cir. 2001) (quoting United States v. Santiago, 83
F.3d 20, 23 (1st Cir. 1996)).  On a Rule 29 motion, the Court "do[es] not weigh the evidence or
make any credibility judgments, as those are left to the jury."  United States v. Merlino, 592 F.3d
22, 29 (1st Cir. 2010) (citing United States v. Ayala-García, 574 F.3d 5, 11 (1st Cir. 2009)).
Instead, the Court "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United
States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and
circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable
to the verdict," Meléndez-González, 892 F.3d at 17 (internal quotation marks omitted).

The verdict will be upheld if it is "supported by a plausible rendition of the record."
Merlino, 592 F.3d at 29 (quoting United States v. Bristol-Martir, 570 F.3d 29, 38 (1st Cir.
2009)).  "If the evidence viewed in the light most favorable to the verdict gives equal or nearly
equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,"
however, the Court must reverse the conviction because "where an equal or nearly equal theory

of guilt and a theory of innocence is supported by the evidence viewed in the light most

favorable to the prosecution, a reasonable jury <u>must necessarily entertain</u> a reasonable doubt."

<u>United States v. Burgos</u>, 703 F.3d 1, 10 (1st Cir. 2012) (quoting <u>United States v. Flores-Rivera</u>,

56 F.3d 319, 323 (1st Cir. 1995)).

### B.        Charged Offenses

As discussed above, Mr. Forte was charged with conspiracy to commit securities fraud, in

violation of 18 U.S.C. §§ 1348 and 1349, and securities fraud and aiding and abetting securities

fraud, in violation of 15 U.S.C. §§ 78(b) & 78ff(a); 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2.

> "The unlawful trading in securities based on material, nonpublic information, or illegal insider trading, is a well-established violation of Section 10(b) of the Securities Exchange Act . . . and the [SEC's] Rule 10b-5." <u>United States v. Bray</u>, 853 F.3d 18, 24 (1st Cir. 2017). "Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." <u>Salman v. United States</u>, 580 U.S. 39, 41 (2016) (citing 15 U.S.C. § 78j(b) (prohibiting the use, "in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance in contravention of such rules as the [SEC] may prescribe") and 17 C.F.R. § 240.10b–5 (forbidding the use, "in connection with the sale or purchase of any security," of "any device, scheme or artifice to defraud," or any "act, practice, or course of business which operates . . . as a fraud or deceit")).

<u>United States v. Chan</u>, 981 F.3d 39, 51 (1st Cir. 2020).

### C.        Mr. Forte's Asserted Grounds for Acquittal

In his motion for acquittal, Mr. Forte asserts that the Government failed to present

sufficient evidence to prove that "Mr. Forte owed a duty of trust or confidence to Peter Forte" or

that "Peter Forte gave David Forte any insider information." [ECF No. 222 at 9].

1.  <u>Sufficiency of Evidence as to Whether Mr. Forte Owed A Duty of Trust or
Confidence to Peter Forte</u>

The Government proceeded on a "misappropriation theory of insider trading, which

'outlaws trading on the basis of nonpublic information by a corporate "outsider" in breach of a

duty owed not to a trading party, but to the source of the information.'"  <u>United States v.

Altvater</u>, 954 F.3d 45, 53 (1st Cir. 2020) (quoting <u>United States v. O'Hagan</u>, 521 U.S. 642, 652–

53 (1997)).  Under this theory, "the government must show that there was 'a breach of a "duty of

trust and confidence" owed by the tipper,' [here, Forte,] 'to the insider,' [here, Peter Forte]."  <u>Id.</u>

at 53 (quoting <u>United States v. Parigian</u>, 824 F.3d 5, 13 (1st Cir. 2016)).  Mr. Forte asserts that

Peter Forte and Mr. Forte's relationship as brothers alone is insufficient to create such a duty.

[ECF No. 222 at 11–13].  Instead, according to Mr. Forte, the Government was required, and

failed to show, that they shared "a history, pattern, or practice of sharing confidences."  [<u>Id.</u> at

10–11 (citing <u>Parigian</u>, 824 F.3d at 14)].  The Government responds that the First Circuit has not

decided whether a familial relationship alone is enough to establish a duty of trust and

confidence, but regardless, the evidence established that Mr. Forte owed this duty to his brother.

[ECF No. 224 at 7–10].

"In an exercise of its statutory rule-making authority . . . , the Securities and Exchange

Commission ('SEC') . . . promulgat[ed] a rule in an attempt to 'clarify and enhance' the

groundwork of misappropriation liability by providing a non-exhaustive list of possible

definitions of instances when . . . a duty [of trust and confidence] might arise."  <u>United States v.

McPhail</u>, 831 F.3d 1, 5 (1st Cir. 2016) (citing Selective Disclosure and Insider Trading, 64 Fed.

Reg. 72,590, 72,610 (proposed Dec. 28, 1999) (codified as amended at 17 C.F.R. § 240.10b5-2)).

The rule states, in relevant part, that a "duty of trust or confidence" exists

> [w]henever the person communicating the material nonpublic information and the
> person to whom it is communicated have a history, pattern, or practice of sharing

confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality;

[and]

[w]henever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or **sibling**; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5-2(b)(2)–(3) (emphasis added).

As the Government points out, the First Circuit has not determined whether a familial relationship is alone sufficient to establish this duty, but other circuits have held, at least with respect to marital relationships, that the fact of the relationship alone is not enough, and that the Government must otherwise show "a history, pattern, or practice of sharing confidences."  See United States v. Kanodia, 943 F.3d 499, 506 (1st Cir. 2019) (citing SEC v. Yun, 327 F.3d 1263, 1272–73 (11th Cir. 2003); United States v. Chestman, 947 F.2d 551, 571 (2d Cir. 1991) (en banc)).

Peter Forte testified that he does not share "personal confidences" with Mr. Forte, but also explained that he trusts him, [ECF No. 230 at 61:2–21], and that they engage in casual conversation about work, including about when Peter Forte was busy with work, [id. at 62:4–8]. Peter Forte further testified that they see each other at family events; that they are hobbyist wine-makers and make wine together; that they assist each other with home projects; and, that they, particularly during the time period in question, spoke frequently.  [Id. at 42:6–43:4, 67:3–8].  He has also lent Mr. Forte money in the past.  [Id. at 63:13–64:2].  Additionally, Peter Forte does

Mr. Forte's taxes.  [Id. at 42:6–15].  This would require that Mr. Forte share his financial

information with Peter Forte, which, in turn, the jury could have reasonably inferred that Mr.

Forte would have expected Peter Forte to keep confidential.  [Id.].  "[R]esolving all doubts . . . in

favor of the [government]," Larrabee, 240 F.3d at 21 (alteration in original) (quoting SEC v.

Sargent, 229 F.3d 68, 75 (1st Cir. 2000)), the Court concludes that based on this evidence and the

reasonable inferences therefrom, the jury could have found beyond a reasonable doubt that the

brothers had a history, pattern, or practice of sharing private and confidential information and

that Mr. Forte therefore owed Peter Forte a duty of trust and confidence.

Additionally, the jury could have found, based on Mr. Younis' testimony, that Mr. Forte

understood that he was in fact supposed to keep the specific information at issue confidential.

As noted above, Mr. Younis testified that Mr. Forte instructed Mr. Younis: (1) on how to trade to

make it seem like he did not have information about the Analog-Linear Deal, and (2) not to buy

Analog securities, because Peter Forte worked there, presumably so the trading could not be

traced back to him.  [ECF No. 215 at 130:17–132:11].  This too provides support for Mr. Forte

owing, and breaching, a duty of trust and confidence to his brother, Peter Forte.

       2.    Sufficiency of Evidence as to Whether Mr. Forte Obtained MNPI from
             Peter Forte

Mr. Forte additionally argues that the evidence failed to establish beyond a reasonable

doubt either that Mr. Forte acquired MNPI at all or that he acquired such MNPI from Peter Forte,

because the evidence supporting the verdict was entirely circumstantial and direct evidence

contradicted both conclusions.  [ECF No. 222 at 14–17].

Mr. Younis testified that it was his understanding that Mr. Forte had learned that Analog

would be acquiring Linear from Peter Forte.  [ECF No. 215 at 131:13–133:25].  Additionally,

although Peter Forte testified that he did not believe Mr. Forte got information about the Linear

acquisition from him, he also testified that Mr. Forte could have figured something out and could not rule out that possibility.  [ECF No. 230 at 67:3–68:3].

The First Circuit has explained that a misappropriation theory of insider trading, "can be, and often is, proven by circumstantial evidence."  Larrabee, 240 F.3d at 21.  It has

> applied six factors to guide [its] examination of whether there was sufficient evidence to support a conviction for securities fraud under the misappropriation theory: "(1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the tippee."

Chan, 981 F.3d at 57 (quoting Larrabee, 240 F.3d at 21–22).

As to factor (1), the jury could have found that Mr. Forte had access to the information based on Peter Forte's involvement in due diligence for the Analog-Linear deal, at a time when he and Mr. Forte spoke more than usual and the fact that Peter Forte could not rule out that the information came from him.  In fact, the evidence shows that Peter Forte and Mr. Forte spoke over the phone the same weekend that Peter Forte was working on the Analog-Linear deal and was on a "tight schedule" to finalize a "synergy report" that needed to be ready by the end of the following Monday.  [ECF No. 215 at 49:9–54:2; Ex. 4].

As to factor (2), it is undisputed that Mr. Forte had close personal friendships with both Mr. Younis and Mr. Manning.

As to factors (3)–(4), as detailed above, Mr. Forte exchanged numerous calls with Mr. Younis and/or Mr. Manning, within minutes or hours of: (1) Mr. Forte speaking with Peter Forte and (2) Mr. Younis' and Mr. Manning's Linear trades.  [Ex. 122].  As one example, on Thursday, July 21, Mr. Forte had a brief call with Peter Forte.  [Id.].  Roughly an hour later, Mr. Younis received a number of short calls from someone at Period Realty Trust, which the jury reasonably could have inferred was Mr. Forte (who worked there at the time).  [Id.].  Within half

an hour of the last of these calls, Mr. Younis bought thirty-five Linear call options.  [Id.].  As another example, Mr. Forte spoke with Peter Forte several more times on the evening of July 21. [Id.].  The following day, on Friday, July 22, Mr. Forte had a brief, twenty-three-second call with Mr. Manning, and just two minutes later Mr. Manning purchased 1,000 Linear shares.  [Id.]. Such close-in-time communication supports a finding of misappropriation.  See Larrabee, 240 F.3d at 23 (concluding "timing of [] events [was] . . . significant" where a minute after a brief phone call with the defendant, the alleged tippee called his trading assistant to make a substantial purchase of stock); United States v. Chan, 352 F. Supp. 3d 54, 77 (D. Mass. 2018) ("Just four days after communicating with [defendant], [the alleged tippee] started to place numerous large orders to purchase Akebia shares, to sell Akebia put options, and to purchase Akebia call options. . . . When an individual makes an uncharacteristically large investment in a stock soon after speaking with someone who possesses material, nonpublic information relating to that stock, this is strong circumstantial evidence that the investment was based on such information."), aff'd, 981 F.3d 39 (1st Cir. 2020).

As to factor (5), while Mr. Younis had engaged in some trading prior to July 2016, as discussed above, he typically made relatively small investments and held one stock over a long period of time.  [ECF No. 216 at 57:12–24].  The jury could have found that this was a very different pattern of trading than his large purchases of Linear securities and then the almost immediate sales of those securities in July 2016.  Likewise, although Mr. Manning was a more active trader, his Linear trades were larger and yielded much larger profits than his previous trading.  [Id. at 61:21–63:19].  Finally, as to factor (6), Mr. Younis testified that Mr. Forte instructed him not to buy Analog shares and on how to buy Linear shares to avoid detection,

which also supports misappropriation.  [ECF No. 215 at 130:17–132:11].

Considering the totality of this evidence, the jury could have reasonably concluded that Mr. Forte misappropriated MNPI and then shared it with Mr. Younis and Mr. Manning.

## III.      NEW TRIAL UNDER RULE 33

### A.      Legal Standard

On a motion for a new trial under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "In considering a motion for a new trial, district courts may 'weigh the evidence and evaluate the credibility of witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'"  Merlino, 592 F.3d at 32 (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).  "[I]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  Id. at 32–33 (internal quotation marks omitted).  "A district court 'judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.'"  United States v. Rivera-Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)).

### B.      Discussion

Mr. Forte argues that he is entitled to a new trial, because (1) the evidence that he owed a duty of trust and confidence to his brother was "weak," and (2) as to whether Mr. Forte obtained MNPI from Peter Forte, the verdict "was against the weight of evidence."  [ECF No. 222 at 13, 17–19].  Concerning the duty of trust and confidence: the Court agrees with the Government that Mr. Forte's argument merely recasts the sufficiency arguments he relies on in seeking acquittal

and finds that he has failed to demonstrate the type of "exceptional circumstances" that may justify a Court "intrud[ing] upon the jury function of credibility assessment." Merlino, 592 F.3d at 32–33 (internal quotation marks omitted).  The First Circuit has cautioned that "where the award of a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial, . . . it [must be] quite clear that the jury has reached a seriously erroneous result." Rivera-Rangel, 396 F.3d at 486 (internal quotation marks and citation omitted)).  The Court finds that no such "seriously erroneous result" has occurred here, and thus Mr. Forte's motion for a new trial is DENIED on this ground.

As to whether Mr. Forte obtained MNPI from Peter Forte: Mr. Forte argues that the Court should evaluate both Peter Forte's and Mr. Younis' credibility, as it may do on a motion for a new trial, and find that Peter Forte's testimony is far more credible than Mr. Younis' given the "unique circumstances of Mr. Younis' immunity agreement [that] warrant discounting his testimony more than a typical cooperating witness." [ECF No. 222 at 18–19].  In Mr. Forte's view, the Court should credit Peter Forte's testimony that unequivocally establishes that Peter Forte "never gave MNPI to his brother," disregard Mr. Younis', and thus find there is insufficient evidence to support the finding that Mr. Forte obtained MNPI from Peter Forte.  [Id. at 17–19].

The circumstances of Mr. Younis' testimony were as follows: Mr. Younis, having pleaded guilty to the same insider trading charges as charged against Mr. Forte, and having been sentenced, was subpoenaed by the Government to testify at trial, without a cooperation agreement and without meeting with the Government to prepare.  [ECF Nos. 45, 49, 83; ECF No. 215 at 121:12–122:23].  On direct, Mr. Younis testified that he paid Mr. Forte a portion of

his earnings from the Linear trades in cash. [ECF No. 215 at 137:17–138:17]. On cross, defense counsel asked him where the cash came from. [Id. at 161:1–11]. Mr. Younis responded that he had an "emergency fund," and when asked whether in his construction business he "often receive[d] cash from customers," he responded that he "receive[d] all kinds of payments," including cash, but has since stopped this practice. [Id. at 161:12–20; 162:22–163:7]. When defense counsel asked whether in 2016 "customers paid [him] in cash, [and he] just put it in [his] safe in [his] office," Mr. Younis, on the advice of counsel, asserted his Fifth Amendment rights against self-incrimination. [Id. at 162:22–163:10].

The Government then requested a sidebar. [ECF No. 215 at 163:11–12]. At sidebar, the Government explained that it had become aware that defense counsel had been communicating with Mr. Younis' attorney about this issue, and, in case it came up, the Government had prepared an application for immunity, which the Government gave to the Court. [Id. at 163:15–18]. The Government represented that the immunity application had not been negotiated with or presented to Mr. Younis' counsel. [Id. at 163:21–164:14]. The Court then released the jury for the day. [Id. at 165:22–166:1].

After the jury was released, the Court spoke with the parties as well as Mr. Younis' counsel. [ECF No. 215 at 166:14–168:4]. The Court granted the Government's application and approved its proposed order, which provided, in relevant part, that "no testimony or other information compelled under this Order (or any information directly or indirectly derived from such testimony or other information) may be used against [Mr.] Younis in any criminal case

except a prosecution for perjury, giving a false statement or otherwise failing to comply with this Order."  See [ECF Nos. 204, 205].

Before recessing for the day, the Court explained that defense counsel would be allowed to cross-examine Mr. Younis on the immunity order, and that the Government could then address it on re-direct.  [ECF No. 215 at 167:6–168:4].

The following day, both parties moved for the Court to instruct the jury on the immunity order.  [ECF No. 216 at 6:3–24].  The Government advocated for the Order to be read to the jury. [Id. at 6:18–24; 7:12–19].  Defense counsel did not object to the Order being read, but also requested that the Court read a proposed instruction.  [Id. at 7:25–8:11].  The Government also represented that it had no Giglio or Brady materials.[6]  [Id. at 9:24–11:15].  The Court declined to read the Order and gave the jury the following instruction:

> So you heard yesterday that Mr. Younis invoked his Fifth Amendment right on the stand.  We took a recess to sort of deal with the implications of that, and this is

---

[6] Following Forte's trial, on August 14, 2023, Mr. Manning sent a letter to the Government, which was then filed with the Court, requesting the "immediate production of the following" items:

1. Any and all records or documents (including any electronic communications) regarding the government's investigation into John Younis for tax fraud, or any other financial crimes including money laundering;
2. A copy of the immunity order given to John Younis during the trial of David Forte;
3. Any and all records or documents (including any electronic communications) regarding the decision to give immunity to John Younis, including, but not limited to, the substance of any communications with counsel for Younis concerning granting him immunity and the likelihood of Younis invoking his Fifth Amendment at David Forte's trial;
4. Any and all impeachment materials pertaining to John Younis, including any investigation related to his admissions at David Forte's trial; and
5. Any and all filings or submissions of the U.S. Attorney's Office for the District of Massachusetts to the Department of Justice regarding the immunity order given to John Younis, including the description of any potential criminal exposure for which immunity was needed or requested.

> where we are now: Once he invoked his Fifth Amendment right not to incriminate himself, the government filed an application with me in which they sought immunity for him.  The application was in proper form.  I signed the order.  He's now immunized.  That means that his testimony cannot be used against him in any subsequent criminal proceeding unless he testifies untruthfully, in which case he can be prosecuted for perjury or making a false statement.  So it can't be used against him unless he testifies falsely.

[Id. at 14:18–15:5].  Defense counsel then continued her cross-examination.  [Id. at 15:13].  Mr. Younis testified that he now had an immunity order, that he had not met with the Government prior to testifying but was aware that his attorney had, and that he had met with his attorney to prepare twice, for roughly a half an hour each time.  [Id. at 15:14–16:17].  Mr. Younis then testified that, for forty years, he had accepted cash payments for his business, had not declared that cash on his income tax returns, thus "cheat[ing] the government of taxes."  [Id. at 16:18–17:10].  He also stated that he had falsified deductions, business expenses, and the cost of goods sold.  [Id. at 17:11–18:18].

Following the close of evidence, during its charge to the jury, the Court provided a further instruction on Mr. Younis' testimony:

> You've also heard the testimony of a witness, Mr. Younis, who during his cross-examination invoked the Fifth Amendment and then, upon application of the government, was immunized and who may have participated in the crime charged against the defendant and has pled guilty.  Immunity here does not mean that Mr. Younis cannot be prosecuted for the things he testified about.  What it does mean is that his testimony cannot be used against him, nor can any evidence derived from his testimony be used against him unless he testified falsely.

> The testimony of someone who is immunized or who may have participated in the crime charged against the defendant should be considered with particular caution.  Some people in these positions are entirely truthful when testifying.  Others may have had a reason or motive to make up stories or exaggerate about what others did because they want to help themselves in some way.  You must determine whether

---

[ECF No. 221 at 1].  The Government responded, referring Mr. Manning to the Court's immunity order, stating that it "has no additional discoverable information to produce . . . in response to [the] remaining requests" and objecting to "requests numbered 3 and 5," to the extent they "seek internal Department of Justice communications and/or submissions."  [ECF No. 223].

the testimony of Mr. Younis has been affected by any interest he may have in the outcome of this case or any prejudice for or against the defendant or any benefits he has received as a result of his testimony, including being immunized. You may consider his guilty plea in assessing his credibility, but you are not to consider his guilty plea as evidence against Mr. Forte in any way. A guilty plea speaks only to the guilt of the person that pled guilty.

As with any witness, it is for you to decide whether to accept some, all, or none of Mr. Younis' testimony and give what weight – and what weight if any to give to that testimony.

[ECF No. 217 at 51:14–52:16].

The Court does not find that these are the sort of "exceptional circumstances" that warrant the Court "intrud[ing] upon the jury function of credibility assessment," where defense had the opportunity to cross-examine Mr. Younis on the immunity order and the Court instructed the jury both on the substance of the order and on the potential implications of immunity on a witness's testimony. Merlino, 592 F.3d at 32–33 (internal quotation marks omitted). Likewise, although Peter Forte testified that he did not provide Mr. Forte with information on the Analog-Linear Deal, he also testified that he could not rule out that Mr. Forte nonetheless figured something out. [ECF No. 230 at 67:3–68:3]. Even if the Court were to credit Peter Forte's testimony over Mr. Younis', it was not the "unequivocal" disavowal that Mr. Forte purports it to have been. [ECF No. 222 at 17]. Finally, even if the Court were to find Mr. Younis not credible and ignore his testimony in its entirety, the evidence would still support a finding that Mr. Forte obtained MNPI from Peter Forte (whether Peter was aware of it or not), given, as discussed above, see supra, the brothers' frequent communications while Peter Forte was working on the Analog-Linear deal; Mr. Forte, Mr. Younis, and Mr. Manning's close relationships, the

numerous calls exchanged between them within minutes or hours of Mr. Younis' and Mr. Manning's trades; and Mr. Younis' and Mr. Manning's atypical trading patterns.

The Court thus finds that the "interest of justice" does not require a new trial, and Mr. Forte's motion is <u>DENIED</u>.

## IV.        CONCLUSION

Accordingly, for the reasons explained above, Mr. Forte's motion for acquittal, or alternatively, a new trial, [ECF No. 222], is <u>DENIED</u>.

**SO ORDERED.**

February 16, 2024                                   /s/ Allison D. Burroughs

                                                   ALLISON D. BURROUGHS
                                                   U.S. DISTRICT JUDGE